## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY (NEWARK)

| | | |
|---|---|---|
| Stephen Giercyk, Ajay Das and James and Emma Immes, on behalf of themselves and all other similarly situated, | : : : : | |
| Plaintiffs, | : : | |
| v. | : : | |
| National Union fire Insurance Company of Pittsburgh, PA, d/b/a National Union Fire Insurance Company, a division of American International Group, Inc. (AIG), Healthextras, Inc., Healthextras Benefits Administrators, Inc., Catamaran Health Solutions, LLC f/k/a Catalyst Health Solutions, Inc., Healthextras Insurance Agency, Inc., American International Group, Inc., d/b/a Group Insurance Trust, for the account of Healthextras, Alliant Insurance Services, Inc., f/k/a Driver Alliant Insurance Services, Inc., Alliant Services Houston, Inc., f/k/a JLT Services Corporation, and Alliant Insurance, Services Houston, LLC, f/k/a Capital Risk, LLC and f/k/a Jardine Lloyd Thompson, LLC and Virginia Surety Company, Inc. | : : : : : : : : : : : : : : : : : | Civil Action No: 2:13-cv-6272-FSH-MAH   CLASS ACTION |
| Defendants. | : | |

## PLAINTIFFS' MOTION AND MEMORANDUM OF LAW FOR PRELIMINARY APPROVAL OF SETTLEMENT, CONDITIONAL CERTIFICATION OF THE SETTLEMENT CLASS, AND APPROVAL OF NOTICE PLAN

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

   I.    LITIGATION HISTORY ....................................................................... 2

   II.   THE PARTIES INVOLVED .................................................................. 5

       A.    The Plaintiffs ................................................................................ 5

       B.    The Settling Defendants ............................................................. 6

           1.    Catamaran ....................................................................... 6

           2.    National Union ............................................................... 6

           3.    Virginia Surety ............................................................... 7

           4.    Alliant ............................................................................ 7

           5.    HealthExtras LLC .......................................................... 7

       C.    Non-Settling Parties ................................................................... 7

           1.    Stonebridge .................................................................... 7

           2.    Federal ........................................................................... 8

           3.    Fidelity .......................................................................... 8

           4.    J.C. Penny ...................................................................... 8

   III.   SETTLEMENT NEGOTIATIONS ........................................................ 9

   IV.   PROVISIONS OF THE SETTLEMENT AGREEMENT ....................... 10

       A.    The Settlement Class ................................................................ 10

       B.    The Compensatory Provisions ................................................. 10

       C.    The Release Provisions ............................................................ 11

       D.    Attorneys' Fees, Expenses and Class Representative Case Contribution Fees ......................................................................... 12

LEGAL ARGUMENT .......................................................................................... 13

   I.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE. 13

       A.    The Standard for Granting Preliminary Approval of the Settlement. ........ 13

       B.    The Proposed Settlement Easily Qualifies for Preliminary Approval. ...... 14

           1.    The Proposed Settlement is the Result of Vigorous, Informed, Arm's- Length Negotiation. ....................................... 15

           2.    The Extent of Litigation and Discovery at the Time the Settlement Agreement Was Negotiated Supports Preliminary Approval. ......... 16

3.  The Proposed Settlement is Well Within the Range of Possible Approval. .................................................................................. 16

II.   THE SETTLEMENT CLASS SATISFIES THE REQUIREMENTS FOR CLASS CERTIFICATION. ................................................................. 17

A.   The Settlement Class Meets The Requirements Of Rule 23(a). ......................... 18

1.  The Numerosity Requirement Has Been Satisfied. ................................... 18

2.  The Commonality Requirement Has Been Satisfied. .............................. 18

3.  The Typicality Requirement Has Been Satisfied. .................................... 19

4.  Plaintiffs Will Adequately Protect the Interests of the Class.................... 20

B.   The Requirements of Rule 23(b)(3) Are Satisfied Because Questions Common to the Class Predominate and a Class Action Is Superior to Other Available Methods of Adjudication. .................................................................... 22

1.  Predominance Exists Here. ....................................................................... 22

2.  Superiority Exists Here. ............................................................................. 23

C.   The Three Principal Plaintiffs' Counsel Firms Should Be Appointed Lead Class Counsel........................................................................................ 25

III.   THE COURT SHOULD APPROVE THE NOTICE PLAN. .................................. 25

A.   The Plan and Form of Notice.............................................................................. 26

B.   The Plan Satisfies Rule 23 and Constitutional Due Process.............................. 27

C.   The Proposed Notice Timeline. ......................................................................... 28

IV.   PLAINTIFFS' MOTION FOR LEAVE TO FILE A MOTION FOR ATTORNEYS' FEES, EXPENSES, AND CASE CONTRIBUTION FEES FOR THE PLAINTIFFS. ........................................................................... 29

CONCLUSION.................................................................................................................. 29

## TABLE OF AUTHORITIES

**PAGE**

### CASES

*Austin v. Pa. Dept. of Corp.*,
876 F. Supp. 1437 (E.D. Pa. 1995) .......................................................................... 15

*Barnes v. Am. Tobacco Co.*,
161 F.3d 127 (3d Cir. 1998)..................................................................................... 20

*Byrd's v. Aaron's Inc.*,
784 F.3d 154 (3d Cir. 2015)..................................................................................... 21

*Carnegie v. Household Int'l, Inc.*,
376 F.3d 656 (7th Cir. 2004) ................................................................................... 24

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)..................................................................................... 17

*Curiale v. Lenox Grp., Inc.*,
No. 07-1432, 2008 WL 4899474 ............................................................................. 15

*Fisher Bros. v. Phelps Dodge Indus., Inc.*,
604 F. Supp. 446 (E.D. Pa. 1985) ........................................................................... 15

*Girsh v. Jepson*,
521 F.2d 153 (3d Cir. 1975)..................................................................................... 14

*Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2d Cir. 2000)....................................................................................... 17

*Gregory v. McCabe, Weisberg & Conway, P.C.*,
No. 13-cv-6962, 2014 WL 2615534 (D.N.J. June 12, 2014).................................. 14

*Guzman v. VLM, Inc.*,
No. 07-1126, 2008 WL 597186 (E.D.N.Y. Mar. 2, 2008)...................................... 23

*In re Bulk (Extruded) Graphite Products Antitrust Litig.*,
No. Civ. 02-6030 (WHW), 2006 WL 891362 (D.N.J. April 4, 2006)..................... 22

*In re Elec. Carbon Prods. Antitrust Litig.*,
447 F.Supp.2d 389 (D.N.J. 2006) ........................................................................... 16

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995)........................................................................... 13, 14, 16

*In re Ins. Brokerage Antitrust Litig.*,
297 F.R.D. 136 (D.N.J. 2013)................................................................................. 13

*In re Linerboard Antitrust Litig.*,
203 F.R.D. 197 (E.D. Pa. 2001).............................................................................. 20

*In re Linerboard Antitrust Litig.*,
292 F. Supp. 2d 631 (E.D. Pa. 2003) .......................................................... 14, 16, 17

-iii-

*In re Mercedes-Benz AntitrustLitig.*,
   213 F.R.D. 180 (D.N.J. 2003)..............................................................22

*In re Merck & Co. Inc., Vytorin/Zetia Sec. Litig.*,
   No. 08–2177 (DMC) WL4482041 (D.N.J. Sept. 21, 2012)....................18

*In re Pet Food Prods. Liab. Litig.*,
   629 F.3d 333 (3d Cir. 2010)................................................................18

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
   962 F. Supp. 450 (D.N.J. 1997) ....................................................13, 25

*In re Remeron End-Payor Antitrust Litig.*,
   No. 02-cv-2007 (FSH), 2005 WL 2230314 (D.N.J. Sept. 13, 2005)........17

*In re Vitamins Antitrust Litig.*,
   209 F.R.D. 251 (D.D.C. 2002)......................................................*passim*

*In Re HealthExtras, LLC*,
   BK No. 15-10368 (Bankr. Md. January 9, 2015) ...................................4

*Jankowski v. Castaldi*,
   No. 01-0164, 2006 WL 118973 (E.D.N.Y. Jan. 13, 2006) .....................24

*Jones v. Commerce Bancorp, Inc.*,
   No. 05-cv-5600, 2007 WL 2085357 (D.N.J. July 16, 2007) ..................13

*New Directions Treatment Servs. v. City of Reading*,
   490 F.3d 293 (3d Cir. 2007)................................................................20

*Petruzzo v. National Union, et al.*,
   5:12-cv-00113-FL (E.D.N.C.) ..............................................................2

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)................................................................19

*Samuel v. Equicredit Corp.*,
   No. 00-6196, 2002 WL 970396 (E.D. Pa. May 6, 2002)........................16

*Smith v. Prof'l Billing & Mgmt. Servs., Inc.*,
   No. 06-cv-04453, 2007 WL 4191749 (D.N.J. Nov. 21, 2007) ...............14

*Stewart v. Abraham*,
   275 F.3d 220 (3d Cir. 2001)................................................................18

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011)................................................................17

*Georgine v. Amchem Prods. Inc.*,
   83 F.3d 610 (3d Cir. 1996)................................................................19

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)......................................................................18

**<u>RULES</u>**

Fed. R. Civ. P. 23(a)(1) ........................................................................................... 18

Fed. R. Civ. P. 23(b)(3) ...................................................................................... 22, 23

Fed. R. Civ. P. 23(c)(2)(B) ................................................................................ 25, 26

Fed. R. Civ. P. 23(e)(1) ........................................................................................... 25

Fed. R. Civ. P. 23 .................................................................................................... 18

Plaintiffs Mario Petruzzo, Jeffery & Kimberly Bush, James & Emma Imes, Arie Waiserman, Christine Hine, Ralph Williams, Sharen Smith, Robert & Maria Watson, Manette Dubuisson, Alice Lacks, Jayantilal Patel, Virginia Riker, Paul & Deborah Johnson, Kenneth Graham, Rita Campbell, Larry & Linda Lake, Stephen Giercyk, Ajay Das, Danny & Tracy Walker, Dagmar Durcik, and Thomas & Kim Broome (collectively, "Plaintiffs")[1] respectfully submit this memorandum of law in support of their motion for: (1) preliminary approval of the settlement between Plaintiffs and Defendants Catamaran Health Solutions, LLC (Catamaran), Alliant Services Houston, Inc. (Alliant), National Union Fire Insurance Company of Pittsburgh, PA (NUFIC), and Virginia Surety Company (Virginia Surety); (2) certification of a class for purposes of the settlement; (3) appointment of Lead Class Counsel for the Settlement Class; (4) approval of the notice plan; and (5) leave to file a motion for Attorneys' Fees, reimbursement of Expenses, and Case Contribution Awards for the named Plaintiffs.[2]

## INTRODUCTION

Plaintiffs brought this action over four years ago to challenge the Defendants' alleged practice of marketing, selling and administrating Benefits Programs (the "Healthextras Policy") as an advertisement stuffer in credit card mailers to consumers.  After years of arm's-length negotiations working towards a settlement in principle, and months of negotiations regarding the terms of settlement, Plaintiffs have reached a final Settlement with the Defendants.  (*See* Settlement Agreement and General Release (the "Settlement Agreement"), attached to the Joint Declaration of Counsel for the Plaintiffs (the "Plaintiffs' Counsel Decl.") as Exhibit 2).  As described in more detail below, the Settlement provides for substantial and immediate economic

---

[1] The Plaintiffs are class representatives in seventeen (17) related cases and include twenty-eight (28) individuals and twenty-one (21) distinct accounts.  *See* Exhibit 1, attached hereto.

[2] All capitalized defined terms used herein have the same meanings ascribed in the Settlement Agreement.

relief to the Classes and represents an excellent outcome for members of the proposed Settlement Classes, providing substantial economic relief.

In considering whether to grant preliminary approval of this settlement, the Court need only determine whether the settlement was reached as a result of informed, arm's-length negotiations and is sufficiently fair, reasonable, and adequate to allow notice to be issued. A final determination of the settlement's fairness will be made at a final approval hearing, to be conducted after Class Members have received notice of this Settlement and have been given an opportunity to object or opt out. As explained in further detail below, the Settlement exceeds the standards governing preliminary approval. There are no obvious deficiencies, and the Settlement falls well within the range of reasonableness. Its terms reflect a fair and reasonable result that is beneficial to all Class Members. The Settlement Agreement was reached only after many months of arm's-length and at times contentious negotiations and following strongly contested litigation over the course of over four years. In light of the work they have invested in this case since its filing in 2012, the Parties and all counsel are well informed and positioned to assess the risks and merit of the case.

Accordingly, Plaintiffs respectfully request that the Court grant their motion.

## BACKGROUND

## I.   LITIGATION HISTORY

The HealthExtras litigation began with the filing of *Petruzzo v. National Union, et al.*, 5:12-cv-00113-FL (E.D.N.C.) on March 6, 2012. Since then, sixteen (16) additional cases have been filed in various federal district courts, including in New Jersey, California, Georgia, Tennessee, South Carolina, Arkansas, Louisiana, Washington D.C., New York and Florida, with almost thirty class representatives and naming varying defendants, but with the marketing entity, Catamaran, f/k/a HealthExtras, common to all cases. *See* Ex. 1. Each of the Complaints allege

similar claims based on the Plaintiffs' core allegation that the defendants were involved in a decade-long scheme to sell "jackpot" group insurance framed as legitimate disability insurance that almost never bore benefits and never was, and never could have been, approved by various states' Departments of Insurance, because the defendants were selling the product to an illegally formed group that they themselves created.

Over the course of four years, the case has been litigated aggressively by all Parties. Plaintiffs' counsel responded to a total of sixteen motions to dismiss. Four of those cases were voluntarily dismissed before a ruling was made, four motions were denied, five were granted, and three were still pending as of the date of the settlement. Four appeals of district court decisions on motions to dismiss were filed and briefed in various Appellate Courts, and one additional appeal was filed following a summary judgment order in Georgia. All five appeals were pending as of the date of settlement. Two appeals were set for oral argument. Of the cases that remain in district courts, three cases have class certification and/or summary judgment briefing scheduled in 2016.

Formal discovery was reached and conducted in nine different cases. Despite aggressive litigation positions, the Parties have worked hard to informally coordinate discovery across all these cases, with varying degrees of success. Protocols for confidentiality and electronically stored information (ESI) format coordination were negotiated and controlled globally by the district court in New Jersey. In addition, thanks in large part to the patience and hard work of Judge Hammer in New Jersey, most of the challenging issues that confronted the Parties as it related to discovery were resolved without formal motions, though resolving these issues did require countless hours of negotiations and multiple in-person court hearings in Newark. The Parties exchanged over 2 million pages of records, responded to over 500 interrogatories, and

conducted 17 depositions all across the country.  The document production and review process was particularly challenging for all Parties due to the fact that a significant portion of the relevant documents in this matter were under the control of HealthExtras, LLC, the entity administering the HealthExtras Program in 2014.  In September and October 2014, the Defendants canceled the HealthExtras Program nationwide and sent cancelation notices to all members effective December 31, 2014.   Immediately afterwards, Healthextras, LLC filed for bankruptcy, on January 9, 2015, in the U.S. Bankruptcy Court for the District of Maryland.  *In Re. HealthExtras, LLC,* BK No. 15-10368 (Bankr. Md. January 9, 2015).  Counsel for Healthextras, LLC filed Notices of Bankruptcy and withdrew appearances in cases that Healthextras, LLC was named. Plaintiffs, through their counsel, filed Proofs of Claims in the bankruptcy court with the assistance of bankruptcy counsel in Maryland.

However, the issue of how to review the documents in the possession of the bankrupt party remained.  On this front, the Parties and Judge Hammer, along with the Healthextras, LLC bankruptcy trustee, formulated a step-by-step plan for the review of relevant documents, including paper files, ESI and client level electronic data stored in Maryland in an AS/400 system.  The paper files consisted of over five hundred boxes in cold storage in an Iron Mountain warehouse in Maryland.   Over the course of days, the Parties identified approximately one hundred boxes of potentially relevant documents to jointly review in Washington D.C.  After two full days of review by a number of attorneys from all Parties, all documents identified as relevant were scanned and provided to all Parties through the creation of joint document repositories. The Healthextras, LLC ESI materials were sent to an outside vendor for processing.  The Parties negotiated search terms for this material, and from that exercise, all documents identified as relevant were uploaded to the joint document repositories.  Finally, the Parties jointly took

-4-

control of Healthextras, LLC's AS/400 database of customer information.  The Parties agree to retain both an AS/400 expert (and former vendor of Healthextras, LLC) as well as the physical storage facility that operates the AS/400 system, in order to conduct statewide searches and maintain the integrity of the customer data.  All of this took a significant amount of time and effort, and could not be accomplished without the hard work and coordination of counsel for the Plaintiffs and Defendants.

In addition to document production and review, depositions were conducted in the cases where fact discovery had formally opened.  A total of ten class representatives were deposed, as were a number of current and former employees of the Defendants.  Further, the Parties agreed to coordinate the depositions of witnesses across all the open cases.  This required much compromise, but ultimately led to a more streamlined and efficient process through which eight depositions were conducted of representatives or former employees of the Defendants and non-parties.

All of this litigation could not be accomplished by only a few lawyers.  In fact, the Healthextras litigation has been prosecuted by a total of twenty-seven (27) attorneys from fourteen (14) law firms for the Plaintiffs across multiple states.  Similarly, each of the multiple Defendants has been represented by multiple law firms, both in a global capacity and locally to cover the many cases filed nationwide.

## II.     THE PARTIES INVOLVED

### A.     The Plaintiffs

The Plaintiffs are individuals who enrolled in and paid for insurance products ("Benefits Programs) which were marketed and sold to them through their credit cards often under the name "Healthextras."   The Benefits Programs were underwritten by different entities over the lifespan of the product and some of the terms and benefits offered changed over time as well.   All of

these individuals' contact information is maintained in the AS/400 database, which served as the system of record for the Benefits Programs as administered by HealthExtras, LLC.

**B.    The Settling Defendants**

**1.    Catamaran**

Catamaran is the Defendant that Plaintiffs contend is responsible for the liability incurred by Healthextras Inc., the entity that was the original **administrator** of the Healthextras Policy. In 2008, Healthextras Inc. changed to the name Catalyst Health Solutions, Inc.  HealthExtras LLC was created in 2010 as a company run by the officers of Healthextras Inc. and Catalyst.  In 2012, Catalyst Health Solutions, Inc. was merged with and into SXC Health Solutions, Inc., which then became Catamaran Health Solutions, Inc.  At that point, Healthextras LLC was then owned by Catamaran Corp., the ultimate parent company of Catamaran Health Solutions, Inc. But Catamaran continued to do business as "Healthextras" well into 2012.  Later in 2012, Healthextras LLC, using the same trade name "Healthextras" that Catamaran had previously used, was sold by Catamaran Health Solutions, Inc. to Disability Benefits Solutions.  In January of 2015, HealthExtras, LLC filed a voluntary petition for bankruptcy in the District of Maryland. HealthExtras LLC's bankruptcy petition is still open.  Since then, in 2015, Catamaran Corp. was purchased by UnitedHealth (UH) and is now an entity under the UH umbrella.

For purposes of this settlement, Plaintiffs contend that Catamaran is the current and successor company that stands in the shoes of HealthExtras, Inc., HealthExtras, LLC, Catalyst Health Solutions, Inc., and Catamaran Health Solutions, LLC.

**2.    National Union**

National Union Fire Insurance Company of Pittsburgh, Pa., is a licensed property and casualty insurance company in many states, is an entity related to American International Group, Inc., (AIG), and was the **underwriter** of the Healthextras Policy from January 1, 2005 to the

policies' termination on December 31, 2014.  The actual master policy at issue in this case existed in Delaware, where it was delivered to the "AIG Group Trust for the Account of HealthExtras."

### 3. **Virginia Surety**

Virginia Surety Company is an insurance company licensed to sell insurance in certain states.  From 2002 to the end of 2014, it has been the **underwriter** for the Emergency Accident and Sickness Benefit which is one of the benefits offered under the HealthExtras Policy. Virginia Surety's actual master policy is issued to a Trust at the Bank of Edwardsville, Illinois.

### 4. **Alliant**

Alliant Services Houston, Inc., Alliant Insurance Services, Inc. and Alliant Insurance Services Houston, LLC are all entities referred to collectively as Alliant for purposes of this settlement.  Alliant is a licensed insurance agent that served as the **broker** for the National Union and Virginia Surety policies from January 1, 2005 through April 30, 2014.

### 5. **HealthExtras LLC**

In or around 2012, Healthextras LLC was created as an entity owned by Catamaran Corp., a subsidiary company of Catamaran Health.  Later in 2012, Healthextras LLC, using the same trade name "Healthextras" that Catamaran used, spun off to become its own company and took over all roles as the **administrator** of the Healthextras Policy.   In January of 2015, HealthExtras, LLC, filed a Voluntary Petition for bankruptcy in the District of Maryland. HealthExtras LLC's bankruptcy petition is still open.

### C.    **Non-Settling Parties**

### 1. **Stonebridge**

The Stonebridge Group, through Stonebridge Life Insurance Company, served as the **underwriter** of the Healthextras Policy sold through direct marketing to holders of branded

credit cards, including J.C. Penny, Sears, Conoco Philips, Exxon and others.   Stonebridge underwrote these policies from 2000 to the policies' termination on December 31, 2014.   During that time for these policies, Healthextras was the administrator and Virginia Surety was the underwriter of Emergency Accident and Sickness Benefit.   Stonebridge Life Insurance Company now includes the former entity that was called J.C. Penny Life Insurance Company.

Stonebridge did not participate in this Settlement.   Litigation continues against Stonebridge regarding its role in the Healthextras Policy.

## 2. **Federal**

Federal, a Chubb Company, issued the master policy for the group accident disability policy from 1999 until 2005 when the master policy was then underwritten by NU.   Reliance was the original underwriter of the disability benefit policy but became insolvent in 1999 and the policies were transferred to Federal.

## 3. **Fidelity**

Fidelity is an insurance company licensed to sell insurance in most states.   It sold the Accident Medical Policy from 1999 to 2002 when the policy was then underwritten by Virginia Surety.   Fidelity has not been sued by Class Counsel regarding its role in the Healthextras Policy.

## 4. **J.C. Penny**

J.C. Penny Life Insurance Company and J.C. Penny Direct Marketing Services, Inc. marketed, underwrote and sold Benefits Programs to holders of branded J.C. Penny credit cards. J.C Penny worked at various times with Healthextras and Stonebridge.   J.C. Penny Life Insurance Company has changed its name to, and now operates as, Stonebridge Life Insurance Company.

## III.   SETTLEMENT NEGOTIATIONS

The Parties first began to discuss early case resolution in 2014, and spent three months vetting at least eight different national mediators.  The Parties agreed upon and jointly engaged the Honorable Judge John Martin (ret.) to mediate the case.  They first undertook in-person mediation in New York City in October of 2014 with Judge Martin.  The Parties spent substantial time preparing for and negotiating the original mediation over a two-day period.  The mediation was unsuccessful and the Parties agreed to continue a dialogue but turn their attention back to the extensive discovery process.

Over the next twelve (12) months there were numerous conference calls, attorney meetings and direct dialogue with Judge Martin, both jointly and separately, to continue the settlement negotiations.  An additional mediation was set for September 2015 in New York, but on the eve of that mediation, the Parties agreed it would not be bear fruit and it was cancelled after much deliberation over the scope of the negotiations and potential terms.

Beginning in December 2015 and advancing through early May 2016, Judge Martin spent a considerable amount of time negotiating the current settlement terms amongst all counsel.  The calls and meetings during this time eventually resulted in a Defendants-only meeting in New York on April 29, 2015 (following a deposition of a Defendants' witness in Philadelphia earlier in the week).  The Defendants-only meeting led to the Parties' agreement on the terms of a settlement in principle, which was then codified in a Memorandum of Understanding.  The Parties then undertook a months-long process to finalize the terms and specific language of the Settlement in a formal Settlement Agreement which is being presented to this Court now after this lengthy, arm's-length negotiation process.[3]

---

[3] As set forth above, Stonebridge did not participate in this Settlement, and litigation by members of one of the classes in some of the filed cases continues against Stonebridge today.

## IV.    PROVISIONS OF THE SETTLEMENT AGREEMENT

### A.    The Settlement Class
The Plaintiffs consist of two separate and distinct nationwide classes:

"**HealthExtras Settlement Class**"

Any individuals who paid for or received any benefits or memberships from or relating to any Benefits Program for which any insurance coverage was underwritten by National Union Fire Insurance Company of Pittsburgh, Pa. Federal Insurance Company, Reliance National Insurance Company, Zurich American Insurance Company, or AMEX Assurance Company.

"**Stonebridge Settlement Class**"

Any individuals who paid for or received any benefits or memberships from or relating to any Benefits Program for which any insurance coverage was underwritten by J.C. Penny Life Insurance Company, or Stonebridge Life Insurance Company.[4]

Settlement Agreement, at ¶¶ 1.24, 1.38.

### B.    The Compensatory Provisions

The Defendant Released Parties have agreed to create a fund in the amount of $15,000,000 (the Settlement Amount), which will provide substantial compensation to consumers who previously purchased the Benefits Programs, regardless of whether the plan was underwritten by National Union (a Settling Defendant), Stonebridge (a Non-Settling Defendant), or another insurer.  *See* Settlement Agreement, at ¶ 1.34.  The money remaining from the Settlement Amount, including any accrued interest thereon, after the subtraction of any approved Case Contribution Fees, approved Attorneys' Fees and Expenses, Administrative Costs, Taxes, and Tax-Related Costs, shall be available for distribution to the Class Members (the Distributable Settlement Amount).  *Id.* at 3.2(a).

---

[4] Plaintiffs have not settled claims against Stonebridge Life Insurance Company, but release claims they have against the Settling Defendants regarding the Benefits Programs underwritten by Stonebridge.  *See* Settlement Agreement at §§ 1.5, 1.15, 1.38, 5.1.

The Distributable Settlement Amount shall be divided among the Class Members who submit Claim Forms based on how much money they paid for the Benefits Programs, when those payments were made, how many years claimants were in the Programs, and whether the Programs that they paid for were underwritten by Stonebridge or someone else, including National Union.  Seventy-five percent (75%) of the Distributable Settlement Amount is allocated to members of the HealthExtras Settlement Class that file claims, and the remaining twenty-five percent (25%) to claim-filing Stonebridge Settlement Class Members.  *Id.* at ¶ 3.2(b).  For the HealthExtras Settlement Class, determining how much each class member paid will be calculated as the total amount of membership fees paid for the Benefit Program between January 1, 2005 and the present plus fifty percent (50%) of all membership fees the Class Member paid for the Benefit Program prior to January 1, 2005 (the Adjusted Membership Fee).  *Id.* at ¶ 1.1. How much each Stonebridge Class Member that files an approved claim is paid based on how long each such member was enrolled in the Stonebridge product, with payments based on the number of years enrolled.  How much and how long each member paid shall be determined via the records maintained in the AS/400 database, which served as the system of record for the HealthExtras Benefits Programs, as well as records maintained by Defendants.  Once the amounts paid by the claimants for each of the Classes is calculated, members will receive their portion of the Distributable Settlement Amount, determined on a *pro rata* basis.  *Id.*

### C.      The Release Provisions

In exchange for the consideration described above, Plaintiffs and Settlement Class Members agree to release Defendants and all of their affiliates, as well as the now bankrupt HealthExtras LLC, from any and all rights and duties relating to claims made in the Actions or the Benefits Programs in general. The full text of the proposed releases is set forth in the

Settlement Agreement.  *See id.* at ¶¶ 1.15, 1.31, V.  Plaintiffs specifically do not release any and all claims it may have against Stonebridge Life Insurance Company, and are free to continue to litigate against Stonebridge, which has not contributed to this Settlement.  *Id.*   Otherwise, the release terms are fairly standard for consumer class actions.

### D.        Attorneys' Fees, Expenses and Class Representative Case Contribution Fees

The Parties and their counsel did not discuss the provisions regarding attorneys' fees or class representative Case Contribution Fees until after the Parties had already agreed upon the terms of the Settlement in principle, had executed the Memorandum of Understanding, and substantive elements of the Settlement Agreement had been negotiated.  Under the terms of the Settlement Agreement, Class Counsel intends to submit a Fee and Expense Application to the Court prior to Final Approval, and any amount awarded by the Court shall be paid by the Settlement Administrator from the Settlement Amount.  *Id.* at ¶ 6.2.  Defendants have agreed not to oppose any application not to exceed five million dollars ($5,000,000), plus costs and expenses.  *Id.*

On behalf of the 28 Class Representative individuals, Class Counsel intends to seek Case Contribution Fees not to exceed the total amount of $85,000.00.  *Id.* at ¶¶ 1.25, 6.1.  This amount is contemplated to be shared amongst Class Representatives.   As contemplated, each of the sixteen (16) HealthExtras Settlement Class Representatives shall receive $4,000 per account (such that joint account holders split a single Fee) and each of the six (6) Stonebridge Settlement Class Representatives shall receive $2,500 per account.  *Id.* at ¶ 6.1.  The Fees are provided per account as opposed to per Class Representative, such that joint account holders split a single Case Contribution Fee and are essentially considered a singe Class Representative.  *Id.* at ¶ 3.2(d).  Defendants have agreed not oppose such a request for Case Contribution Fees, which

shall be paid by the Settlement Administrator to Class Counsel out of the Settlement Amount. *Id.* at ¶ 6.1.

The Parties agree that the Court's failure to approve, in whole or in part, any award for attorneys' fees or Case Contribution Fees shall not prevent the Settlement Agreement from becoming Effective, nor shall it be grounds for termination.  *Id.* at ¶ 6.4.

## LEGAL ARGUMENT

### I.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE.

#### A.    The Standard for Granting Preliminary Approval of the Settlement.

"'The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.'"  *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 144 (D.N.J. 2013) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995)).  While the law favors settlement of complex litigation, Federal Rule of Civil Procedure 23 requires court approval for any compromise of a class action.  Such approval "is a two-step process: preliminary approval and a subsequent fairness hearing."  *Jones v. Commerce Bancorp, Inc.*, No. 05-cv-5600, 2007 WL 2085357, at *2 (D.N.J. July 16, 2007).  At the preliminary approval stage, counsel must submit the proposed terms of the settlement to the Court for preliminary fairness evaluation.  After a preliminary fairness finding and dissemination of notice to the settlement class members, the Court then must conduct a formal fairness and final approval hearing.  *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 562 (D.N.J. 1997).

To grant preliminary approval, a court must find that: "(1) the parties' negotiations occurred at arm's length; (2) there was sufficient discovery; [and] (3) the proponents of the

settlement are experienced in similar litigations."[5]  *Smith*, 2007 WL 4191749, at *1.  Upon such findings, a settlement agreement is entitled to a presumption of fairness and should be granted preliminary approval.  *Id.*  Preliminary approval of a settlement does not require a definitive determination of the fairness of a proposed settlement.  *In re Gen. Motors Corp.*, 55 F.3d at 785 (holding that the "preliminary determination establishes an initial presumption of fairness"); *Smith v. Prof'l Billing & Mgmt. Servs., Inc.*, No. 06-cv-04453, 2007 WL 4191749, at *1 (D.N.J. Nov. 21, 2007).  Rather, a definitive determination of the fairness, reasonableness, and adequacy of a settlement is made at a final approval hearing.  *See In re Linerboard Antitrust Litig.*, 292 F. Supp. 631, 638 (E.D. Pa. 2003).[6]  "Preliminary approval is not binding, and it is granted unless a proposed settlement is obviously deficient."  *Jones*, 2007 WL 2085357, at *2.

**B.      The Proposed Settlement Easily Qualifies for Preliminary Approval.**

The terms of the Settlement represent an excellent result for the Settlement Class.  In addition, the proposed Settlement is entitled to a presumption of fairness because it was negotiated at arm's-length after significant litigation and discovery, and Class Counsel are highly experienced in similar litigation.

---

[5] A fourth factor, the number of objections to the settlement, is not properly evaluated until the final approval stage.  *Smith*, 2007 WL 4191749, at *1 n.3.

[6] The factors considered for final approval of a class settlement include: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best possible recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation.  *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).  "The Court need not, however, consider the *Girsh* factors in the context of" a motion for preliminary approval of a settlement.  *Gregory v. McCabe, Weisberg & Conway, P.C.*, No. 13-cv-6962, 2014 WL 2615534, at 2 n.6 (D.N.J. June 12, 2014).

1.    The Proposed Settlement is the Result of Vigorous, Informed, Arm's-Length Negotiation.

Preliminary approval analysis "often focuses on whether the settlement is the product of 'arms-length negotiations.'"  *Curiale v. Lenox Grp., Inc.*, No. 07-1432, 2008 WL 4899474, at *4 (E.D. Pa. 2008).   Here, the Settlement Agreement is the result of months of arm's-length negotiations, which included several mediation conferences with the Judge Martin, between and among Class Counsel and counsel for Defendants.   During these negotiations, Class Counsel and Defendant's Counsel vigorously advocated their respective clients' positions, both against each other and the Defendants amongst themselves, and all parties were prepared to litigate the case fully if no settlement was reached.   Class Counsel are experienced litigators in consumer class actions like this one.[7]

Based on their experience, Class Counsel believe that this Settlement provides significant benefits to the Settlement Class, avoids the risks and delays associated with continued litigation, and is in the Settlement Class members' best interest.   *See Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985) (the "professional judgment of counsel involved in the litigation is entitled to significant weight" when evaluating proposed settlement); *Austin v. Pa. Dept. of Corp.*, 876 F. Supp. 1437, 1472 (E.D. Pa. 1995) (stating that significant weight should be attributed "to the belief of experienced counsel that settlement is in the best interest of the class").   The Parties' extensive arm's-length negotiations fully support a finding that the proposed settlement is fair.

---

[7] *See* Plaintiffs' Counsel Decl. at ¶ 37 (referencing the experience and qualifications of Plaintiffs' Class Counsel).

2.      The Extent of Litigation and Discovery at the Time the Settlement
        Agreement Was Negotiated Supports Preliminary Approval.

The stage at which settlement occurs demonstrates "whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Gen. Motors Corp.*, 55 F.3d at 813. "Where [the] negotiation process follows meaningful discovery, the maturity and correctness of the settlement become all the more apparent." *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F.Supp.2d 389, 400 (D.N.J. 2006) (citing *In re Linerboard Antitrust Litig.*, 292 F. Supp.2d 631, 640 (E.D. Pa. 2003)). Significant discovery undertaken prior to reaching a settlement supports a finding that the settlement is within the range of reasonableness. *Smith*, 2007 WL 4191749, at *1.

Here, Class Counsel undertook extensive discovery that allowed Class Counsel to be fully informed on all material issues before negotiating a settlement on behalf of the Class. The Parties exchanged over 2 million pages of records, responded to over 500 interrogatories, and conducted 17 depositions all across the country, including the depositions of current and former Defendants' employees and Plaintiffs in the case. *See* Plaintiffs' Counsel Decl. at ¶ 11. In addition, the Parties undertook joint control a significant amount of data from the bankrupt Healthextras entity that exists only in the antiquated AS400 system at a location in Maryland. Accordingly, the extensive discovery taken here supports a finding that the settlement is within the range of reasonableness.

3.      The Proposed Settlement is Well Within the Range of Possible Approval.

This Settlement falls within the range of settlements that could be worthy of final approval as fair, reasonable, and adequate. *See, e.g.*, *Samuel v. Equicredit Corp.*, No. 00-6196, 2002 WL 970396, at *1 n.1 (E.D. Pa. May 6, 2002). Here, the Settlement Agreement is fair, reasonable, and represents an excellent result for the Class. Under the Settlement Agreement,

Defendants have agreed to provide compensatory relief to the Settlement Class in the form of cash payments.  *See* Settlement Agreement at III.  These cash payments will be made to any and all Class Members that file claims after receiving approved notice of the Settlement.  This result is highly favorable to the class.

The compensatory relief from the Settlement provides an immediate and sound recovery in relation to the damages potentially available and the risk of continued litigation.  The ongoing core litigation disputes of the parties and the inherent risk of continued litigation reinforces the fact that the Settlement falls within the range of reasonableness.  *See In re Remeron End-Payor Antitrust Litig* No. 02-cv-2007 (FSH), 2005 WL 2230314, at *24 (D.N.J. Sept. 13, 2005) (citations omitted) (noting that as long as a settlement "is reasonable relative to other factors, such as the risk of no recovery," it may be approved, even if it may "amount to a hundredth or even a thousandth of a single percent of the potential recovery"); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974) *abrogated by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 639 (E.D. Pa. 2003) ("The legal and factual issues involved [in antitrust cases] are always numerous and uncertain in outcome.") (quotations omitted).  In sum, the significant relief available under the Settlement falls well within the range of possible final approval.

## II.     THE SETTLEMENT CLASS SATISFIES THE REQUIREMENTS FOR CLASS CERTIFICATION.

Plaintiffs' unopposed motion satisfies all the requirements of certification of the Settlement Class.  The Third Circuit has approved class certification in light of settlement where the class satisfies the requirements of Federal Rules of Civil Procedure 23(a) (*i.e.*, numerosity, commonality, typicality, and adequacy) and 23(b).  *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc); *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 349 (3d Cir.

2010).  However, in the settlement context, the Court need not consider whether the case would present intractable management problems since, as a result of settlement, there will be no trial. *Sullivan*, 667 F.3d at 322, n.56.  Because the proposed Settlement Class meets all applicable requirements of Rule 23, it should be certified.

### A.    The Settlement Class Meets The Requirements Of Rule 23(a).

To be certified, a class must meet four criteria: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy).  *See* Fed. R. Civ. P. 23.  All of these requirements are met in this case.

### 1.    The Numerosity Requirement Has Been Satisfied.

Numerosity requires the members of a class to demonstrate the class is so numerous that "joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1). Numerosity is generally satisfied where a proposed class exceeds forty (40) class members.  *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).  As the proposed classes each contain hundreds of thousands of members, the numerosity requirement is easily satisfied.

### 2.    The Commonality Requirement Has Been Satisfied.

The Rule 23(a)(2) "commonality" requirement is satisfied if there is *at least one* common question of fact or law between the Plaintiffs' claims and those of the class.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011) (agreeing that "[f]or purposes of Rule 23(a)(2), even a single common question will do").  As such, "the United States Court of Appeals for the Third Circuit 'has recognized that courts have set a low threshold for satisfying this requirement.'"  *In re Merck & Co. Inc., Vytorin/Zetia Sec. Litig.*, No. 08–2177 (DMC), 2012

WL 4482041, at *3 (D.N.J. Sept. 25, 2012) (quoting *Georgine v. Amchem Prods. Inc*., 83 F.3d

610, 627 (3d Cir. 1996)).

Here, there are many common issues of fact and law, including:

- Whether Defendants sold disability insurance policies and collected premiums for those insurance policies that were illegal;

- Whether Defendants illegally sold disability insurance policies and collected premiums for those policies to a group that was not and could not be a legal "blanket group";

- Whether Defendants wrongfully collected and increased premiums for those illegal policies;

- Whether any Defendant or several of the Defendants knew or should have known that selling and collecting premiums for the subject insurance policies was illegal pursuant to applicable law and in derogation of states' interests in regulating the sale of insurance within their borders;

- Whether the Defendants have been unjustly enriched at the expense of Plaintiffs and the Class Members;

- Whether Plaintiffs and the Class Members suffered any injury that was proximately caused by the unlawful acts alleged herein;

- Whether the Defendants acted in conspiracy with each other to perform the illegal acts described herein; and

- Whether Plaintiffs and the Class Members are entitled to recover damages proximately caused by the alleged unlawful conduct, including actual damages consisting of restitution of premiums collected for the illegal policies, treble damages, punitive damages, interest, attorneys' fees, filing fees, and reasonable costs of suit.

These issues are more than sufficient to satisfy Rule 23(a)(2)'s commonality requirement.

3.     The Typicality Requirement Has Been Satisfied.

Plaintiffs' claims are also typical of the claims of the class as a whole, thus satisfying

Rule 23(a)(3).  Rule 23(a)(3) is satisfied "when each class member's claim arises from the same

course of events and each class member makes similar legal arguments to prove the defendant's

liability." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) (citation omitted).  Factual

differences between class members do not defeat typicality if the claims arise from the "same event or practice or course of conduct." *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998).

Here, Plaintiffs' claims and those of class members arise from the same conduct. *See generally In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 207 (E.D. Pa. 2001), *aff'd*, 305 F.3d 145 (3d Cir. 2002). Plaintiffs' claims are typical of claims of all of the Members of the Classes, all of whom owned or purchased the disability insurance coverage or paid premiums for the disability insurance coverage through the Benefits Programs during the Class Period. In fact, the two Classes are specifically tailored to the different underwriters of the Benefits Programs. While Defendants have not yet had the opportunity to challenge the Plaintiffs' typicality formerly in the class certification process, Plaintiffs are confident, given the sworn testimony each Plaintiff provided during their lengthy and detailed depositions, that their claims arise from the same course of events that each Class Member was subjected to, and that this same conduct caused the same injury to all of the Settlement Class Members. The typicality prong is satisfied here.

4.     Plaintiffs Will Adequately Protect the Interests of the Class.

Rule 23(a)(4) is also met because the named plaintiffs will fairly and adequately protect the interests of the class. Adequacy "is satisfied by showing that (1) Class Counsel is competent and qualified to conduct the litigation; and (2) class representatives have no conflicts of interest." *Chocolate*, 289 F.R.D. at 218 (citing *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007)). Here the adequacy requirement is plainly met.

No conflict exists between the named and unnamed class members because their interests are aligned. Plaintiffs and the class members have all been injured by the same conduct. Plaintiffs do not have any interests antagonistic to those of the other class members and all class

-20-

members share a strong interest in proving Defendant's liability.  *See Blood Reagents*, 283 F.R.D. at 234 (finding adequacy requirement met where there was "no evidence of any conflict of interest between the named plaintiffs and the absent members of the putative class").  In proving their claims, Plaintiffs would prove the claims of the class.  *Id.* Further, Plaintiffs have been actively protecting the interests of the Classes.  They have engaged in the prosecution of this matter since its inception, having consistently conferred with Class Counsel, reviewed the various versions of the complaints in the Actions, reviewed and signed their interrogatory responses, provided documents and consulted with their counsel regarding the propriety of the Settlement, and prepared for and sat for day-long depositions.

Plaintiffs are also represented by experienced counsel who has litigated this case vigorously on behalf of the class.[8]  The firms representing Plaintiffs have extensive experience prosecuting cases against these Defendants and in consumer class actions as well.  *See* Plaintiffs' Counsel Decl. at ¶ 37.  They have spent over four years litigating these actions as well.  *See Blood Reagents*, 283 F.R.D. at 233 (finding representation adequate based on counsel's extensive experience prosecuting complex cases).  As a result, the adequacy requirement is satisfied.[9]

---

[8] Defendants are also represented by qualified and competent class actions litigators, well-positioned to evaluate the strengths and weaknesses of continued litigation, as well as the reasonableness of the Settlement.

[9] In addition to the Rule 23 requirements, Courts also analyze the judicially created doctrine of ascertainability when evaluating whether to certify a class.  A class is ascertainable if "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."  *Byrd's v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015).  Here, the class is defined with reference to objective criteria and the determination of whether someone is within the settlement class is administratively feasible because it can be made based on the submission of Claim Forms and HealthExtra's own records.

**B.      The Requirements of Rule 23(b)(3) Are Satisfied Because Questions Common to the Class Predominate and a Class Action Is Superior to Other Available Methods of Adjudication.**

In addition to the four requirements of Rule 23(a), the proposed class must also satisfy at least one provision of Rule 23(b).  Rule 23(b)(3) is satisfied when: (1) the questions of law or fact common to the class predominate over any questions affecting only individual class members ("predominance"); and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy ("superiority").  Fed. R. Civ. P. 23(b)(3); *Anchem*, 521 U.S. at 615.  Both of these requirements are met here.

### 1.      Predominance Exists Here.

The predominance standard requires the Court to "determine whether the common legal and factual issues are more significant than the non-common issues such that the class is 'sufficiently cohesive to warrant adjudication by representation.'"  *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 186 (D.N.J. 2003) (quoting *Amchem*, 521 U.S. at 623).  "'[I]n general, predominance is met when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' [sic] individual position.'"  *In re Bulk (Extruded) Graphite Products Antitrust Litig.*, No. Civ. 02-6030 (WHW), 2006 WL 891362, at *9 (D.N.J. April 4, 2006) (quoting *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 262 (D.D.C. 2002)).  Predominance does not require that every relevant issue before the Court be postured identically for each and every proposed class member.  *Anchem*, 521 U.S. at 623; *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 484 (W.D. Pa. 1999).

To determine whether common issues will predominate, the underlying elements of the substantive claim must be identified.  Here, Defendants' liability turns on, among other things, whether the scheme of marketing and selling the Benefits Programs violates the law.  Every

Class Member's claims may be proven by the same set of facts.  Moreover, determining whether

and to what extent Settlement Class Members were injured turns on common proof.  Regardless,

when common questions of law or fact predominate regarding liability, "the existence of

individual questions as to damages is generally unimportant."  *Guzman v. VLM, Inc.*, No. 07-

1126, 2008 WL 597186, at *8 (E.D.N.Y. Mar. 2, 2008).  Each element presents issues that are

sufficiently cohesive and common to warrant adjudication by representation.  Moreover, because

this case has settled, the Court need not "consider the available evidence and the method or

methods by which plaintiffs would use the evidence to prove the disputed element at trial[,]"

because there will be no trial.  *Sullivan*, 667 F.3d at 306 (internal quotation marks and citation

omitted). As a result, the predominance element is satisfied.

## 2.  Superiority Exists Here.

The superiority prong asks whether "a class action is superior to other available methods

for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The rule

expressly sets forth a list of relevant factors: class members' interest in bringing individual

actions; the extent of existing litigation by class members; the desirability of concentrating the

litigation in one forum; and potential issues with managing a class action.  Fed. R. Civ. P.

23(b)(3)(A-D).  Here, the superiority requirement is satisfied.

First, no Class Members have expressed interest in bringing individual actions other than

those that have filed claims and been rejected, and in fact, no such actions have been filed by

enrollees who have not filed claims.  Second, it is well settled that a class action is the superior

method of adjudication where, as here, "the proposed class members are sufficiently numerous

and seem to possess relatively small claims unworthy of individual adjudication due to the

amount at issue . . . [and] there is reason to believe that class members may lack familiarity with

the legal system, discouraging them from pursuing individual claims."  *Jankowski v. Castaldi*,

No. 01-0164, 2006 WL 118973, at *4 (E.D.N.Y. Jan. 13, 2006).  A class action would be the only practical way of resolving the claims of hundreds of thousands of Class Members, while at the same time, avoiding the potential for repetitious litigation and inconsistent adjudications if the claims were pursued individually.  In light of the fact that each class member has a relatively small damage claim, combined with the fact that consumer class actions like this one are particularly expensive, complicated and lengthy, this is not surprising.  *See, i.e. Graphite Prods.*, 2006 WL 891362, at *16 ("the relatively small purchase price of bulk extruded graphite parts would likely preclude litigating this action outside a class action"); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.") (emphasis omitted).  Third, individual litigation has the potential to result in inconsistent or contradictory judgments, and in fact the Parties have seen some of that inconsistency in the various Actions.  Fourth, a class action presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Because the case is settled, no manageability issues will arise.  *Sullivan*, 667 F.3d at 306. Certification of the Settlement Class will allow for efficient adjudication of claims that would likely not be brought owing to prohibitive legal expenses, while at the same time preserving scarce judicial resources.  Without the class action vehicle, the Class would have no reasonable remedy, and Defendants would be permitted to retain the proceeds of their violations of law. Accordingly, a class action is the best available method for the efficient adjudication of this litigation.

C.     **The Three Principal Plaintiffs' Counsel Firms Should Be Appointed Lead Class Counsel.**

Rule 23(c)(1)(B) provides that "[a]n order that certifies a class action . . . must appoint class counsel under Rule 23(g)."  The factors listed under Rule 23(g) all favor appointment of The Three Principal Plaintiffs' Counsel Firms: Golomb & Honik, P.C., Hemmings & Stevens, P.L.L.C and Aughtman Law Firm, LLC (collectively "Principal Plaintiffs' Counsel") as Co-Lead Class Counsel.

Principal Plaintiffs' Counsel have worked extensively with other attorneys in identifying and investigating the claims, defending various legal motions at the trial level and on appeal, reviewing millions of pages of documents, conducting numerous fact witness depositions and responding to written discovery, among other things.  Collectively, Principal Plaintiffs' Counsel has substantial knowledge of this case in particular and experience in litigating complex consumer class actions in general.  *See* Plaintiffs' Counsel Decl. at ¶ 37.  Principal Plaintiffs' Counsel has expended and will continue to expend the necessary resources to represent the class.  For these reasons Principal Plaintiffs' Counsel, should be appointed class counsel at this juncture of the case.

III.   **THE COURT SHOULD APPROVE THE NOTICE PLAN.**

Once a settlement has been reached on a class-wide basis, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  "For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable efforts."  Fed. R. Civ. P. 23(c)(2)(B).  It is not necessary to actually notify all Settlement Class members; "due process does not require actual notice, but rather a good faith effort to provide actual notice."  *In re Prudential Ins. Co. of*

*Am. Sales Practices Litig.*, 177 F.R.D. 216, 231 (D.N.J. 1997).

As for content of the notice, Rule 23 requires that the notice use clear, concise, and plain language to inform members of:

| | | |
|---|---|---|
| (i) | the nature of the action; |
| (ii) | the definition of the class certified; |
| (iii) | the class claims, issues, or defenses; |
| (iv) | that a class member may enter an appearance through an attorney if the member so desires; |
| (v) | that the court will exclude from the class any member who requests exclusion; |
| (vi) | the time and manner for requesting exclusion; and |
| (vii) | the binding effect of a class judgment on members under Rule 23(c)(3). |

Fed. R. Civ. P. 23(c)(2)(B).  In the settlement context, notice must also "be designed to summarize the litigation and the settlement to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation."  *In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283, 327 (3d Cir. 1998) (internal quotations omitted).

### A.  The Plan and Form of Notice.

In total, there are three different forms of Notice contemplated that will be published or sent directly to Settlement Class Members: (1) the Postcard Notice that will be sent via first class, U.S. mail to all Class Members' last known mailing address; (2) the Long Form Notice which will be posted to the Settlement Website; and (3) the Published Notice that will be published in print media of general circulation.  *See* Settlement Agreement at ¶ 2.5.  The costs of providing Notice will be paid out from the Settlement Fund.

The Postcard Notice will be sent to the last address on file with HealthExtras, which exists on HealthExtras' system accessible to all parties.  The Postcard Notice will be in a form substantially the same as Exhibit B to Plaintiffs' Counsel Decl.  The Published Notice will be distributed to the public through the internet in advertisement network banners as well as published in Readers' Digest, a periodical with a large, national circulation.  *See* Plaintiffs' counsel Decl. at ¶ 28 and the Summary or Published Notice in a form substantially the same as Exhibit E thereto.  The Parties will use reasonable efforts to ensure that the various forms of Notice are mailed or published as soon as administratively feasible, but within sixty (60) days of the Court granting this motion. (Settlement Agreement at ¶ 2.5).

The Settlement Administrator, Heffler Claims Group, will establish and maintain a Settlement Website that will display, *inter alia*: (1) the Long Form Notice in a form substantially the same as Exhibit C to Plaintiffs' Counsel Decl.; (2) the Published Notice (*id.* at Ex. E); (3) contact information for Class Counsel; (4) a complete copy of the Settlement Agreement (*id.* at Ex. A); (4) Claim Forms that can be submitted electronically online or via U.S. Mail ((*id.* at Ex. D), and (5) any and all other materials agreed upon by the Parties.  *Id.* at ¶ 2.8.  In addition, the Settlement Administrator shall maintain a Settlement Telephone Number, established within thirty (30) days of the entry of the Preliminary Approval Order and available on the Postcard Notice (*id.* at Ex. B) and on the Settlement Website, so that Settlement Class Members can call and get answers to Settlement-related inquiries.  *Id.* at ¶ 2.9.

**B.     The Plan Satisfies Rule 23 and Constitutional Due Process.**

The form and content of the Notice plan comply with Rule 23 and constitutional due process.  The Notice plan is reasonably calculated to reach the Settlement Class members.  First, the Notice plan contemplates sending direct notice to all class members at their last known

address to HealthExtras.  If there exists a forwarding address for these class members, Notice will be sent their, and the class action administrator will take all reasonable and efficient efforts to locate class members whose Postcard Notices are returned as undeliverable.  Second, the Notice plan includes a substantial Published Notice component that involves placing notice in periodicals and online that will have substantial reach.

As to the content of Notice, all forms of Notice use easily understood language to concisely and clearly inform Settlement Class Members of the nature of the Actions, the definition of the Settlement Classes certified, the claims and issues, the ability to appear through counsel, the ability and process for requesting exclusion, and the binding effects of the Settlement.  The Notices also explain the terms of the Settlement, the scope of the releases, and how Class Members may opt-out or object.

### C.     The Proposed Notice Timeline.

As outlined in the Proposed Order attached hereto, Plaintiffs propose the following settlement administration timeline, with deadlines measured from the date of the Court's Order granting Preliminary Approval of the Settlement:

| **Deadline** | **Proposed Dates** |
|---|---|
| Entry of Court Order granting Preliminary Approval | |
| Website launch | 30 days after Preliminary Approval |
| Notice is mailed and published | 60 days after Preliminary Approval |
| Filing Deadline for Plaintiffs' Motion for attorneys' fees and expenses | 150 days after Preliminary Approval |
| Deadline for objections and requests for exclusion | 170 days after Preliminary Approval<br>35 days before Final Approval Hearing |
| Deadline for Filing Claims | 170 days after Preliminary Approval |

| **Deadline** | **Proposed Dates** |
|---|---|
| Filing Deadline for Plaintiffs' Motion for Final Approval | 185 days after Preliminary Approval |
| Final Approval Hearing | _____<br>(190–210 days after Preliminary Approval to be set by the Court) |

## IV.   PLAINTIFFS' MOTION FOR LEAVE TO FILE A MOTION FOR ATTORNEYS' FEES, EXPENSES, AND CASE CONTRIBUTION FEES FOR THE PLAINTIFFS.

Pursuant to the above proposed schedule, Plaintiffs seek leave to file a motion for attorneys' fees, reimbursement of expenses, and for Case Contribution Awards for the Plaintiffs in accordance with the Settlement Agreement.   As specified in the Proposed Preliminary Approval Order filed herewith, Settlement Class Counsel's motion for fees, expenses, and Case Contribution Fees shall be filed twenty (20) days in advance of the Settlement objection deadline.   The timing and form of the Notice plan, discussed above, will provide Settlement Class Members with both sufficient notice of the motion for fees and expenses, and a reasonable opportunity to review it prior to determining whether to object to the motion, object to the Settlement Agreement, or opt out of the Settlement Class.   Additionally, as set forth in the proposed Preliminary Approval Order, the Notice shall include the date on which the motion for fees and costs shall be filed, and inform the Class that the motion will be made available on the Settlement Website.

### CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court:

(1)     Preliminarily Approve the Settlement Agreement;

(2)     Certify the proposed Settlement Classes for purposes of the Settlement Agreement and Notice;

(3)     Appoint Golomb & Honik, P.C., Hemmings & Stevens, P.L.L.C and Aughtman Law Firm, LLC as Lead Class Counsel for the Settlement Class;

(4)     Approve the Notice plan; and

(5)     Grant Plaintiffs leave to file a motion for attorneys' fees, reimbursement of expenses, and Case Contribution Awards for the named Plaintiffs.

**Date:** __September 9, 2016__                              Respectfully submitted,

_/s/ Kenneth J. Grunfeld_
Richard M. Golomb, Esquire
Ruben Honik, Esquire
Kenneth J. Grunfeld, Esquire
**GOLOMB & HONIK, P.C.**
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Phone: (215) 985-9177
Fax:    (215) 985-4169
Email:  rgolomb@golombhonik.com
        rhonik@golombhonik.com
        kgrunfeld@golombhonik.com

Aaron C. Hemmings, Esquire
(_pro hac vice_)
**Hemmings & Stevens, P.L.L.C.**
5613 Duraleigh Road, Suite 111
PO Box 90698
Raleigh, NC 27675
Phone: 919-277-0161
Fax:    919-277-0162

Joseph "Jay" H. Aughtman, Esquire
(_pro hac vice_)
**Aughtman Law Firm, LLC**
1772 Platt Place
Montgomery, AL 36117
Phone: 334-215-9873
Fax:    334-213-5663

_Attorneys for Plaintiff and the Class_

## CERTIFICATE OF SERVICE

I, Kenneth J. Grunfeld, Esquire, hereby certify that on this **9th** day **of September, 2016**, I caused a true and correct copy of the foregoing **Plaintiffs' Motion and Memorandum of Law for Preliminary Approval of Settlement, Conditional Certification of the Settlement Class, and Approval of Notice Plan** to be filed and served via the Court's CM/ECF filing system on all counsel of record.

_____ /s/ *Kenneth J. Grunfeld* _____

**Date:** **September 9 , 2016**        **KENNETH J. GRUNFELD, ESQUIRE**